DUCKER, JUDGE:
Claimant, John L. Creamer, Administrator of the Estate of Muriel Creamer, deceased, claims damages for death by wrongful act occasioned by the negligence of the staff and employees of the Weston State Hospital in placing, on May 25, 1963, one Wanda Maxine Janes, a mentally ill person, in the same room with said Muriel Creamer, resulting in the homicide of the latter by the said Wanda Maxine Janes. The claim is alleged to be in such amount allowable under the statute not to exceed $111,500.00, but which on hearing was stipulated to be limited *14 in the statute then in force to $10,000.00 for wrongful death and $15,000.00 for pecuniary loss. There was no proof of pecuniary loss.
The claimant rests his case entirely upon the reports of the physicians as to the mental and physical condition of Wanda Maxine Janes just previous to and upon her admission to the hospital, and the testimony and cross examination of Respondent’s witnesses, Dr. Neil M. McFadyen, Superintendent of the hospital, and of Wanda Jacqueline Reed, a psychiatric aide who was on duty at the hospital at the time of the death of Muriel Creamer.
There is no conflict in the evidence relating to the place, time or cause of the death of Muriel Creamer. She died about nine o’clock on the evening of May 25, 1963 in a room in the Weston State Hospital in which Wanda Maxine Janes was also confined, the cause of death being the result of anoxia of the brain caused by strangulation. Muriel Creamer had been strapped in her bed by the hospital attendants, bound at her waist and feet to prevent her from leaving her bed, and when found dead she had a piece of muslin cloth about her neck. The evidence shows that Wanda Maxine Janes was admitted to the hospital at 10:00 A.M. on that same day and had been in seclusion in a room adjoining that in which Muriel Creamer was confined. At 8:30 P.M. of that day Wanda Janes was moved to the room occupied by Muriel Creamer, and about a half hour later, at 9:00 P.M., the latter was found dead with Wanda Janes standing near or over her. A regular “bed check” was made prior thereto at 8:00 P.M. 'and apparently all was well. There was never any sound of violence or other evidence of a struggle in the room of the homicide, but it was apparent that Wanda Maxine Janes had committed the act causing the death.
The question presented in this case is whether or not the Department of Mental Health has been negligent in its handling of the confinement of Wanda Maxine Janes, a decision of which rests either on specific alleged negligence on the part of the hospital staff or on a failure of the State to provide adequate quarters and care for a mentally ill person such as Wanda Janes.
*15 From the exhibits introduced in evidence by the claimant, it appears that Wanda Janes was committed as a mentally ill person to Weston State Hospital by the Mental Hygiene Commission of Marion County upon the examination of said person by Drs. H. L. Criss and J. R. Tuckwiller, who, from affidavits of witnesses that although she was friendly she was irrational, considered herself as mistreated by everybody, suffering from a depression complex and ideas of persecution, recommended that she be admitted to a state hospital for treatment. Upon admission to the hospital, Dr. H. S. Chu said that on the admission interview Wanda Janes was extremely hostile and argumentative, that she tried to run out of doors, that her behavior became wild as she was quite irritable and resistive, irrational in her speech, her ideas were manifested with persecution and delusion that someone was trying to kill her, but as the interview proceeded she seemed to become relaxed; and that upon physical examination she strongly refused to go to the admission ward, behaved wildly and was given medication. The impression diagnosis was “Schizophrenic Reaction, Paranoid Type.” The report of Dr. Neil M. McFadyen, Superintendent of the Hospital, to Prosecuting Attorney of Lewis County is substantially similiar to that of Dr. Chu that Wanda Janes was suffering from a severe mental illness manifested by delusional ideas to such a degree that she was unable to know the difference between right and wrong in relation to her ’alleged acts, and that she would be considered insane.
The testimony of Dr. McFadyen is exceptionally clear and uncontradicted, and was not in denial of the opinions expressed on the admission or commitment reports. He explained that Wanda Janes came within the usual classification of persons of a schizophrenic-paranoid and that her diagnosis was “not any different than anyone with a similar classification.” He also specifically answered in the negative the question as to whether from her diagnosis or from other information available to Dr. Chu, he had any knowledge of any fact that would have put Dr. Chu on notice that Wanda Janes “might have had some violent homicidal tendency.” There is no testimony or other evidence in the case which shows that the hospital authorities knew or should have known within a *16 period of less than twelve hours confinement that Wanda Janes had any violent homicidal tendency. We believe that the evidence to such effect must be positive, which it was not in this case, to charge the hospital authorities with any duty beyond that which was performed by them in the matter.
Solitary confinement of 'Wanda Janes did not seem reasonably necessary. The lack of solitary confinement can hardly be considered a proximate cause of homicide by a friendly inmate, although she may be irrational or even wild at times.
From the evidence it appears that the hospital was built to accommodate six hundred inmates, that at the time in question there were twenty-two hundred to twenty-three hundred inmates, and that they handled 1500 admissions per year with a large number of them being schizophrenic paranoids. Some 40 to 45 patients were in the section in which the parties here were confined and the door to the room was only 20 feet from the desk of the aide in charge on the floor. Because of the congestion and inability of the hospital to otherwise provide for her, Wanda Janes was removed from a room in which two others were quartered into a room in which there was only Muriel Creamer. From the evidence it appears that there had never before been such a result of such action by the hospital, and such fact makes it more unreasonable to conclude that a homicide by such a person could be anticipated under such circumstances.
In a sense it might be thought that the State has been negligent in not providing more hospital facilities for the mentally ill, but we cannot determine either the moral or financial responsibility or capability of the government in that phase of welfare. The authorities and the public have to accept what the State provides, as there is no legal duty in the matter, ■and in the absence of a clear legal duty we cannot place liability on the State simply on an alleged moral obligation without negligence on the part of its agents or some contractual obligation applicable to the matter.
For this Court to base a claim on a moral obligation we are limited in our consideration of moral obligations of the State. The statute, in our opinion, waives the constitutional immunity of the State in cases where the claimant would otherwise have *17 a legal claim. In view of the facts, we find no negligence which would be the basis for a judgment.
We are, therefore, of the opinion to and do disallow the claim of the claimant in this case.
Claim Disallowed.